# In the United States Court of Federal Claims

No. 23-1278
(Filed Under Seal: February 7, 2024)
Reissued: March 6, 2024[1]

|  |  |
|---|---|
| PDS CONSULTANTS, INC., | ) |
| Plaintiff, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant, | ) |
| and | ) |
| SUPERIOR OPTICAL LABS, INC., | ) |
| Defendant-Intervenor. | ) |

*David Scott Gallacher*, Kutak Rock, Washington, DC, for plaintiff.

*Joshua David Tully*, U.S. Department of Justice, Washington, DC, for defendant.

*John Edward McCarthy, Jr.*, Crowell & Moring LLP, Washington, DC, for defendant-intervenor.

**OPINION AND ORDER**

*SMITH*, **Senior Judge**

In this bid protest, plaintiff PDS Consultants, Inc. ("PDS") protests the U.S. Department of Veterans Affairs' ("Agency's" or "VA's") voluntary corrective action following a prior bid protest by defendant-intervenor Superior Optical Labs, Inc. ("Superior"). PDS argues that the Agency lacked a rational basis to take corrective action and, in the alternative, that the scope of the action was too broad. Before the Court are three dispositive motions: (1) defendant-intervenor's Motion to Dismiss; (2) plaintiff's Motion for Judgment on the Administrative Record ("MJAR"); and (3) defendant United States' and defendant-intervenor's respective Cross-Motions for Judgment on the Administrative Record (collectively, "CMJARs"). For

---

[1] An unredacted version of this opinion was issued under seal on February 7, 2024. The parties were given an opportunity to propose redactions, and those redactions are included herein.

reasons explained below, the Court grants defendant-intervenor's Motion to Dismiss; grants defendant's and defendant-intervenor's respective CMJARs; and denies plaintiff's MJAR.

I.  **Background**

   A.  **The Solicitation**

The VA administers a nationwide network of clinics and other healthcare facilities for veterans, known as the Veterans Integrated Services Network ("VISN"). Veterans visit VISN facilities for a range of health needs, including, as relevant here, prescription eyeglasses, lenses, and other optical products (collectively, "eyewear"), and optician appointments. The VA accordingly procures dozens of different types of eyewear as well as onsite licensed optician services.

This bid protest concerns the Agency's procurement of eyewear products and optician services in "VISN 7," a tri-state administrative region covering Alabama, Georgia, and South Carolina. The Agency issued Solicitation No. 36C24721R0067 (the "Solicitation") on August 25, 2021, under Federal Acquisition Regulations ("FAR") Part 12, which creates a simplified procedure for the procurement of commercial items. AR 9, 198 (citing 48 C.F.R. ("FAR") 52.212-3); *see* FAR 12. The purpose of the Solicitation was to procure seventy types of eyewear (corresponding to seventy product Contract Line-Item Numbers ("CLINs")) and onsite licensed optician services (corresponding to one service CLIN). The Solicitation contemplated a contract with a one-year base period from 2021 to 2022, and four one-year option periods running from 2022 to 2026. AR 3, 106. It further stated that the Agency would procure eyewear on a firm-fixed-price, indefinite delivery, indefinite quantity ("IDIQ") basis—meaning that the awardee would commit to a fixed per-unit price for each line item, and the Agency would have the contractual right to procure as much or as little of each line item as it needs, subject only to minimum and maximum purchase limits. *Id.*; FAR 16.504(a).[2] IDIQ contracts are used "when the Government cannot predetermine, above a specified minimum, the precise quantities of supplies or services that the Government will require during the contract period." FAR 16.504(a).

Although an IDIQ contract does not commit the Agency to procuring a particular quantity of any product, the Agency is nonetheless obligated to estimate, prior to procurement, its actual need for every CLIN it expects veterans to order over the contract period. *See* FAR 12.202, 10.001, 11.103. The Solicitation's price schedules incorporate these need estimates as follows: For each of the five performance periods and for each CLIN, the offeror was instructed to calculate the Total Estimated Cost by multiplying the proposed price with the Agency's Estimated Quantity of the CLIN. AR 61–104. To illustrate, the entry for CLIN 1 in the 2021–2022 price schedule is reproduced below:

---

[2]  Unlike for eyewear products, the Agency committed to a specific number of hours of onsite licensed optician services. *E.g.*, AR 61.

| BASE PERIOD: OCTOBER 1, 2021 – SEPTEMBER 30, 2022 ||||||| 
|---|---|---|---|---|---|---|
| LIN | Name | Description | Estimated Quantity | Unit | FOB Destination Price | Total Estimated Cost |
| 0001 | Eyewear Frames and Lens - Complete Eyeglass, CR-39, Clear, SV | Complete Eyeglasses (frames and lenses). Clear plastic single vision eyewear frames and lenses. CR-39 lens material, single vision, plastic lens type. | 8425 | EA | $ | $ |

AR 61. The Solicitation also instructed offerors to add the Total Estimated Cost across CLINs and report the total estimated cost for each annual period, as well as for all five periods put together. *See* AR 69, 78, 87, 96, 104.

Offerors were also required to submit sample eyeglass frame kits and provide a "narrative response describing their experience providing prescription eyeglasses manufacturing and onsite licensed optician services." AR 197. According to the Solicitation, the Agency would first inspect the sample kits to screen offerors for Technical Acceptability on a pass-fail basis. AR 196. Importantly, the Agency would then select the most advantageous surviving offer based on the offeror's experience and price, *with experience being more important than price*. AR 196–97. The Agency also reserved the right to evaluate prices for reasonableness, and to award the contract to a higher-priced offeror with more experience providing prescription eyeglasses manufacturing and onsite licensed optician services. AR 197.

**B.     Proposals and Evaluation**

PDS and Superior both submitted timely proposals.[3] *See* AR 599. The Agency determined that both proposals were technically acceptable at the threshold. AR 602. On the experience factor, the Agency gave Superior's proposal a rating of "Good" and PDS's proposal a lower rating of "Satisfactory." AR 607–08. Neither the technical evaluation nor the experience ratings are disputed by the parties. Instead, the present controversy turns on the parties' proposed prices, and how those prices interact with the Agency's quantity estimates.

The Agency's total estimated quantity for the base period and four option periods—calculated by aggregating expected quantities across product line items for the relevant period—varied between 70,567 to 87,316 units per year, or 386,269 units in total. AR 61–104. Using these quantities as the baseline, PDS's proposed prices translated into a Total Estimated Cost of $9,718,000 over the five-year period. AR 321. Superior's corresponding proposed cost was $29,952,245. AR 510. PDS therefore outbid Superior by a factor of three. This difference proved decisive in the Agency's assessment of the offers. The contracting officer concluded that PDS's proposal provided better value to the government even though Superior performed better on the experience factor—which was *more* important than the price factor—because "Superior's

---

[3]     Two other offerors submitted timely proposals as well. *See* AR 599. Their proposals are not relevant to the present dispute.

additional years of prescription eyeglasses manufacturing experience do not warrant paying a substantially higher price (208%)." AR 610. The Agency awarded the contract to PDS on November 23, 2022. AR 829.

###     C.    PDS's Pricing, the Agency's Errors, and Reconsideration of PDS's Award

PDS proposed what may be called asymmetric or "unbalanced" pricing, which means offering some products well below market rate and others well above market rate. *See* FAR 15.404-1(g)(1). Some line items were provided for nominal prices or even for free: optician services for $0 per hour; CLIN ▮ for ▮ per unit; and CLINs ▮, ▮, and ▮ for ▮▮▮▮ per unit each, compared to defendant-intervenor's corresponding prices of ▮, ▮, ▮, ▮, and ▮, respectively. *See* AR 611–32. At the other end of the spectrum, PDS proposed per-unit prices of ▮ for CLIN ▮ and ▮ for CLIN ▮, compared to Superior's proposed prices of ▮ and ▮, respectively. *E.g.*, AR 619. Overall, as the contracting officer determined in her evaluation, PDS's prices, as compared to the market rate (not just Superior's proposed prices), were "significantly understated" for forty-five or more CLINs, and "significantly overstated" for five CLINs. AR 632–33. The contracting officer nonetheless determined that PDS's unbalanced prices did not propose an unacceptable risk of overpayment by the taxpayer, *see* FAR 15.404-1(g)(1), because "*[e]ven at the 50% elevated demand* for overstated CLINs, the amount the Government would pay to PDS would not exceed the aggregate average market price . . . or the price that would be paid to the next-in-line [offeror]." AR 633 (emphasis added).

When a proposal contains unbalanced pricing, the overall cost of a contract is very sensitive to errors in the quantity estimates of individual CLINs. After the contract award, the Agency gradually discovered that its quantity estimates were wrong by margin far greater than 50%. The errors revealed themselves in three stages. First, on December 22, 2022, Superior protested the award decision before the GAO, arguing among other things that the Agency's quantity estimates did not reflect actual need. The Agency prevailed, but only because (said the GAO) the errors in the Agency's quantity estimates were so "readily apparent from the terms of the [Solicitation]" that Superior should have challenged them pre-award, rather than post-award. Compl. Ex. 3 at 5 [hereinafter GAO Decision]; *see Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313 (Fed. Cir. 2007). Second, on March 22, 2023, Superior filed a protest in this Court. In its Complaint, Superior argued that the Agency's errors go above and beyond the patent defect in the Solicitation, citing discrepancies between the Solicitation and the Agency's own Independent Government Cost Estimate, which was prepared prior to the issuance to the Solicitation but disclosed to Superior after the award decision. Complaint at 9–13, ECF No. 1, *Superior Optical Labs, Inc. v. United States*, No. 23- 402 (Fed. Cl. Mar. 22, 2023). Eight days later, defendant moved to voluntarily remand the case so that the Agency may "review" its quantity estimates and "reconsider" its award decision. Defendant's Unopposed Motion for Voluntary Remand at 1, ECF No. 33, *Superior Optical Labs, Inc.*, No. 23-402 (Fed. Cl. Mar. 30, 2023). The Court granted the Agency's motion on April 4, 2023. Order Granting Defendant's Motion to Remand at 1, ECF No. 17, *Superior Optical Labs, Inc.*, No. 23-402 (Fed. Cl. Apr. 4, 2023). Shortly thereafter, the Agency requested and received a series of line-item usage reports from Superior in the latter's capacity as the incumbent contractor for VISN 7. *See* AR 978–3724. These reports were the third and last piece of evidence showing that the Agency's estimates were flawed.

The picture that emerged is as follows.  First, the Agency had significantly underestimated the aggregate units of eyewear it would require.  The Solicitation's aggregate estimated quantity over five years was 386,279 units.  AR 61–104.  By June 2023, however, the Agency believed that it would require more than three times that number, or 884,106 *additional* units.  AR 61–104, 3709–16 (raw data); Def.'s CMJAR at 5–6 (summary of data).[4]  Second, the Agency *over*estimated its need for some line items and *under*estimated its need for other line items.  These revisions were dramatic.  For example, the Agency's estimates required upward corrections of 1300-fold (that is, 13,226%) for line item ▮; and 40-, 16- and 53-fold for line items ▮, ▮, and ▮, respectively.  AR 63, 66–67, 3709–10; Def.'s CMJAR at 6.  As for downward corrections, the Solicitation's estimates exceeded actual need by 20- and 3-fold respectively for line items ▮ and ▮.  AR 66–67, 3710; Def.'s CMJAR at 6–7.  PDS submitted unbalanced prices for many of the line items that required an appreciable revision.  *See* AR 611–32.  Finally, the Agency discovered that it had no actual need for line items 15, 68, 69 and 70, and that the Solicitation had left out several types of eyewear it did need.  *E.g.*, AR 3710 (line items marked "NEW").  Additionally, some products listed in the Solicitation, it turned out, "no longer exist."  AR 3731.

### D.     The Agency's Final Corrective Action

On voluntary remand, the Agency considered several corrective actions and ultimately elected to: (1) terminate (rather than amend) PDS's contract; and (2) cancel (rather than amend) the initial Solicitation and issue a new solicitation.  *See* Amended Notice of Corrective Action at 1, ECF No. 21, *Superior Optical Labs*, No. 23- 402 (Fed. Cl. July 14, 2023).  The Agency's decision was made after consulting "VISN 07 prosthetics representatives and VISN 07 subject matter experts," and determining that the Solicitation would require extensive changes, such as adding and eliminating line items in the price schedule and revising other parts of the Solicitation, including establishing new spending parameters.  AR 3730–31; *see* AR 3923.

On June 2, 2023, the Agency notified PDS that its contract would be unilaterally terminated for convenience pursuant to FAR 52.212-4(l).  AR 3726.  Importantly however, the parties ultimately terminated the contract through a bilateral settlement agreement, formally referred to as a "Modification of Contract."  AR 3727–28 (agreement dated June 30, 2023).  The legally operative section of the agreement states in full:

The purpose of this modification is to:

Fully terminate for the convenience of the government.

The Contractor hereby releases, waives, and discharges the Government from any and all liabilities (direct or indirect), obligations, claims, appeals, demands, and

---

[4]     Plaintiff does not dispute defendant's summaries.  *See* Pl.'s MJAR Resp. at 7–8.  Plaintiff instead argues that the Agency cannot reconsider an award based partly on line-item usage reports for periods after the contract award.  *Id.* at 11–22.  The Court finds that the line item reports for post-award usage merely confirm the errors apparent in pre-award data, and permit the Agency to quantify pre- and post-award errors with precision.

> requests for equitable adjustment (absent fraud), administrative or judicial, legal or equitable, arising out of, or related to this modification.

AR 3727.  The signature of PDS's President, Mr. Sean M. Loosen, appears immediately below that text.  *Id*.  Relatedly, the second and final page of the agreement contains stock language from FAR 49.603-6 for executing "[n]o-cost settlement agreement[s]," a type of termination agreement where the parties winding down a contract are willing to settle all cost-related disputes such as outstanding payments or performance.  AR 3728.

The Agency canceled the initial Solicitation on July 14, 2023.  AR 3733.  To meet the Agency's needs while the new procurement played out, the Agency also issued, on July 31, a solicitation for a seven-month bridge contract, with the competition limited to PDS and Superior.  AR 3739–3995.  The Court learned at oral argument that the Agency had awarded the bridge contract to PDS on September 27, 2023, and that PDS began performance on October 1, 2023.[5]  As far as the Court is aware, the long-term procurement process is still ongoing.

### E.     This Litigation

PDS filed this protest on August 9, 2023, alleging that the Agency's decisions to take corrective action, terminate PDS's contract, and cancel the initial Solicitation were arbitrary and capricious.  Complaint at 2, ECF No. 1 [hereinafter Compl.].  By way of relief, plaintiff asks the Court to reinstate its contract, issue a declaratory order, and award certain costs.  *Id.* at 19.  Superior timely intervened.  *See* Proposed Defendant-Intervenor's Motion to Intervene, ECF No. 10; Order Granting Motion to Intervene, ECF No. 12.

The parties have briefed two sets of motions in parallel, which the Court recounts in turn.  First, on August 30, 2023, Superior filed a Motion to Dismiss under Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC").  Defendant-Intervenor's Motion to Dismiss, ECF No. 24 [hereinafter Def.-Int.'s MTD].  In the Motion, Superior argues that PDS relinquished its right to bring this suit under PDS's June 30 settlement agreement with the Agency.  *Id.* at 1.  On September 27, PDS filed its Response, arguing that the waiver was limited to claims relating to termination costs.  Plaintiff's Response to Defendant-Intervenor's Motion to Dismiss at 1, ECF No. 30 [hereinafter Pl.'s Resp. to MTD].  On October 6, Superior filed its Reply.  Defendant-Intervenor's Reply in Support of its Motion to Dismiss and Reply and Response in Support of its Cross-Motion for Judgment on the Administrative Record, ECF No. 34 [hereinafter Def.-Int.'s MTD & MJAR Reply].

Second, the parties briefed motions for judgment on the administrative record.  PDS filed its Motion on September 8, 2023.  Plaintiff's Motion for Judgment on the Administrative Record, ECF No. 27 [hereinafter Pl.'s MJAR].  On September 22, defendant and Superior both filed their respective Cross-Motions and Responses to PDS's Motion.  Defendant's Cross-Motion for Judgment on the Administrative Record, ECF No. 29 [hereinafter Def.'s CMJAR]; Defendant-Intervenor's Cross-Motion for Judgment on the Administrative Record, ECF No. 28

---

[5]     Superior filed a pre-award protest to the bridge contract solicitation in this Court on September 28, 2023, but stipulated to dismissal on November 8.  *See Superior Optical Labs, Inc. v. United States*, No. 23-1669, ECF Nos. 1, 25.

- 6 -

[Def.-Int.'s CMJAR].  On September 29, Plaintiff filed its Reply and Response.  Plaintiff's Reply in Support of its Motion for Judgment on the Administrative Record and Response to Cross-Motions for Judgment on the Administrative Record, ECF No. 31 [hereinafter Pl.'s MJAR Resp.].  On October 6, both defendant and Superior filed their Replies in support of their respective cross-motions, with Superior consolidating its reply as to all motions in a single document.  Defendant's Reply in Support of its Cross-Motion for Judgment on the Administrative Record, ECF No. 33 [hereinafter Def.'s MJAR Reply]; Def.-Int.'s MTD & MJAR Reply.

The Court held oral argument on October 17, 2023, and the dispute is now ripe for adjudication.

## II.     Standard of Review

When reviewing a motion to dismiss under RCFC 12(b)(6), the Court "must accept as true all the factual allegations in the complaint . . . and we must indulge all reasonable inferences in favor of the non-movant."  *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001) (internal citations omitted).  Dismissal is appropriate "when the facts asserted by the claimant do not entitle [it] to a legal remedy."  *Spectre Corp. v. United States*, 132 Fed. Cl. 626, 628 (2017) (quoting *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)).

In bid protests, this Court applies the Administrative Procedure Act's standard of review for agency actions, which may be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  *See* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706; *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005).  The standard is deferential, and the Court may not substitute its judgment for that of the agency.  *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285–86 (1974).  "[A] bid award may be set aside if either: (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure."  *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  The Court's "inquiry is unchanged in the corrective action context."  *Superior Optical Labs, Inc. v. United States*, 152 Fed. Cl. 319, 322–23 (2021) (citing *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018)).

When adjudicating an RCFC 52.1 motion for judgment on the administrative record, the Court "make[s] factual findings from the record evidence as if it were conducting a trial on the record."  *Bannum*, 404 F.3d at 1354.  The protestor "has the burden of demonstrating the arbitrary and capricious nature of the agency decision by a preponderance of the evidence."  *PAE Applied Techs., LLC v. United States*, 154 Fed. Cl. 490, 509 (2021).  The Court determines whether a party has met its burden of proof based on findings from the record.  *Bannum*, 404 F.3d at 1355.

## III.    Discussion

### A.     Defendant-Intervenor's Motion to Dismiss

The first question before the Court is whether PDS waived its right to bring this claim under the terms of PDS's settlement with the Agency. In its Motion to Dismiss, Superior argues that the agreement unambiguously bars this protest because PDS's request for reinstatement of the contract is an "obligation[], claim[], appeal[], [or] demand . . . [for] . . . judicial, legal or equitable [relief] arising out of, or related to [the] modification." Def.-Int.'s MTD at 6 (quoting AR 3727). Superior further stresses that the "any and all" language of the release is very broad and admits of no exception. *Id.* at 4–5. The government echoes Superior's arguments in its briefs on the motions for judgment on the administrative record. *See* Def.'s CMJAR at 13.

In response, PDS concedes that it is bound by the settlement agreement but argues that the agreement exclusively addressed "claims for termination costs"—which refers to claims associated with setoffs, invoices, pre-termination expenses incurred by the contractor, or a pro rata portion of the price of the contract. Pl.'s Resp. to MTD at 1, 4, 6. According to PDS, the settlement was a routine formality to confirm that neither the government nor plaintiff planned to seek costs in relation to the terminated contract, and the "any and all" language of the release broadly encompasses all cost-related claims, but only such claims. *Id.* at 4–5.

PDS argues that three factors confirm its reading of the agreement. First, according to PDS, the settlement agreement was executed under the authority of FAR regulations that relate to cost-based issues. *Id.* at 3–5. Second, PDS produces correspondence between itself and the Agency's Termination Contracting Officer, Chelsea Smith, which purportedly show that the scope of the settlement was limited to cost-based claims. *Id.* at 5–7. Finally, PDS contends that a broad reading of the agreement would unfairly and irrationally tie its hands in collateral litigation, such as challenges to follow-on solicitations and contract awards. *Id.* at 7.[6]

The Court holds that PDS waived its right to seek reinstatement of the Agency's award decision. "Contract interpretation begins with the language of the written agreement." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003). "Provisions . . . phrased in clear and unambiguous language . . . must be given their plain and ordinary meaning, and [courts] may not resort to extrinsic evidence to interpret them." *Id.*; *accord Premier Off. Complex of Parma, LLC v. United States*, 916 F.3d 1006, 1011–12 (Fed. Cir. 2019). Furthermore, courts must interpret contract documents "so as to harmonize and give reasonable meaning to all of its parts." *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). Whenever possible, we must avoid adopting an interpretation "that leaves a portion of the contract useless, inexplicable, void, or superfluous." *Id.*

In this case, the plain and ordinary language of the settlement agreement is clear and unambiguous. Plaintiff forfeited the right to bring "any and all . . . requests for equitable adjustment . . . administrative or judicial, legal or equitable, arising out of, or related to this [contract termination]." AR 3727. Plaintiff's bid to have the contract or the underlying Solicitation reinstated is clearly a "claim[] or "demand[]" before the "judicia[ry]" "arising out of" and "related to" the termination of the Contract.

---

<sup>6</sup>   PDS also makes other miscellaneous arguments. *See* Pl.'s Resp. to MTD 7–8. The Court finds them unpersuasive.

Context points the same way.  Beginning within the four corners of the contract, plaintiff insists, relying on stock language pertaining to "[n]o-cost settlement agreement[s]" on the second page of the contract, *see* AR 3728, that the entire agreement is limited to cost-based claims.  But while settling cost-based claims clearly was one objective of the contract, it was not the *only* objective, nor even the *primary* objective.  The agreement makes this crystal clear by stating that "[t]he purpose of this settlement . . . [is to] [f]ully terminate for the convenience of the government."  AR 3727.  Because reinstating the contract necessarily requires the Court to disregard this language, plaintiff is effectively arguing that an implicit purpose of the agreement not only trumps the express purpose but somehow erases it.  That cannot be.

Turning to extrinsic evidence—an e-mail exchange between the Agency's Termination Contracting Officer Chelsea Smith ("Smith") and plaintiff's Vice President Robert Yopps ("Yopps"), *see* Pl.'s Resp. to MTD at 5 & Ex. 1 [hereinafter Correspondence]—the Court first notes that, because the agreement is unambiguous, the inquiry is already at an end.  *Coast Fed. Bank*, 323 F.3d at 1038.  Furthermore, because the e-mail correspondence is not in the administrative record and plaintiff did not file a motion to complete or supplement the record, the correspondence is outside the Court's purview.  *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court.").

In any event, the evidence does not support plaintiff's position.  The correspondence shows that Smith sent the settlement agreement to plaintiff on June 22, 2023, asking plaintiff to "review and return back signed [as] soon as possible."  Correspondence at 5.  On June 28, Smith clarified that the agreement is "a bilateral modification per FAR 43.103(a)."  *Id.* at 3.  The next day, Yopps wrote back acknowledging that the proposed agreement is "asking us to waive our rights to file a claim associated with the action," and then asking Smith to "please revise the amendment to remove the waiver."  *Id.*  In her reply on June 30, Smith stated that "[t]he waiver verbiage cannot be removed," and reiterated that "the Government is not doing a unilateral termination for convenience" and is instead "requesting a bilateral agreement."  *Id.* at 1.  She also stated her view that the purpose of the agreement is to "confirm closeout functions to make sure there is no claim or settlement.  Basically stating we have no outstanding voices on this requirement and I am able to perform my [a]dministrative duties with this contract."  *Id.*  Plaintiff's President Sean Loosen then signed the agreement on the same day.  AR 3727.

Plaintiff argues, based on Smith's reference to "no outstanding voices," that the *sole* purpose of the agreement was to settle cost-based claims.  *See* Pl.'s Resp. to MTD at 5.  That does not follow.  As stated earlier, the express purpose of the agreement is to "fully terminate" the contract, AR 3727, and Smith twice confirmed that fact by explaining that the termination was a *bilateral* action contingent on plaintiff's consent, Correspondence at 1, 3.  Therefore, Smith's statements are best understood to mean that the agreement settles *both* cost-based and non-cost-based claims.  Further, Yopps himself understood that the plain text of agreement "is . . . asking us to waive our rights to file a claim associated with this action," and he asked Smith to "revise [the text] to remove the waiver."  *Id.* at 1–2.  Although Smith refused to amend the agreement, PDS's President ratified it anyway.  The Court concludes that PDS understood, or at

least ought to have understood, that it was waiving its right to seek reinstatement of the contract in this Court or any other tribunal.

Although the Court rules against PDS on Superior's Motion to Dismiss, it shares PDS's concern that an overbroad interpretation of the "any and all" language in the waiver might also sweep in "challenges to PDS's performance ratings, a non-monetary claim requesting interpretation of a contract, or even other pre-award or post-award challenges to a follow-on solicitation . . . as part of the Agency's proposed corrective action."  Pl.'s Resp. to MTD at 7.  The Court therefore reassures plaintiff that the settlement, though broad, is limited to the terminated contract.  *E.g.*, *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341–42 (Fed. Cir. 2009); *see also Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992)) ("The court will construe . . . ambiguous term[s] [if any] against the drafter of the contract when the nondrafter's interpretation is reasonable.").  Post-termination procurements, solicitations, bid evaluations, and awards are not matters "arising out of, or related to [the contract termination]" within the meaning of the June 30 settlement agreement.

### B. The Parties' Motion and Cross-Motions for Judgment on the Administrative Record

Having concluded that plaintiff released its claims in settlement, the Court briefly addresses the merits of the case.  In the Court's view, the Agency's decision to go back to the drawing board was not just legally permissible—it was an excellent example of an agency using voluntary corrective action to fix major mistakes and improve governance.  Starting with the legal baseline, corrective actions are agency actions intended "to correct a perceived prior error in the procurement process, or, in the absence of error, to act to improve the competitive process."  *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 986 n.1 (Fed. Cir. 2018).  Whether to take voluntary corrective action is, by definition, a matter within the agency's discretion.  *See Data Monitor Sys., Inc. v. United States*, 74 Fed. Cl. 66, 74 (2006).  Even when the underlying error is the agency's own fault, the agency may properly accord "primacy . . . [to] its own needs and the penalty to the fisc [over] the harm to the frustrated bidder in losing the prospective contract."  *Vanguard Sec. Inc. v. United States*, 20 Cl. Ct. 90, 109 (1990).  On review, courts must apply "the APA's highly deferential rational basis standard."  *Dell Fed. Sys.*, 906 F.3d at 992 (collecting cases) (internal quotation marks omitted).  This Court cannot second-guess either the decision to take corrective action or the scope of the action so long as the contracting agency "provided a coherent and reasonable explanation of its exercise of discretion."  *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004).

The Agency's decisions to terminate the contract and rescind the Solicitation unquestionably meet this standard.  As explained previously, the Agency discovered pervasive errors in its estimation of actual need.  The expected procurement quantity of several CLINs was drastically overestimated or drastically underestimated; the Agency did not need some CLINs at all; and the Solicitation omitted some products it did need.  This much is undisputed, but plaintiff argues that the Agency acted unreasonably by cancelling, instead of amending, (1) the contract and (2) the Solicitation.

The Court disagrees on both counts. First, the Agency had compelling reason to terminate the contract. PDS argues that, because it was awarded an IDIQ contract—the "IQ" stands for indefinite quantity—the Agency could fully rectify the problem by not amending the contract at all, or, at best, making "contract modifications [] that are within the scope of the contract." Pl.'s MJAR at 29 (quoting FAR 6.001(c)). In fact, given PDS's unbalanced pricing scheme, amending the contract in the way PDS suggests may well have resulted, as the FAR warns, "in [the] payment of unreasonably high prices." FAR 15.404-1(g)(1). When a vendor underprices some products in a bundle while overpricing others, any mistake by the buyer in estimating how much of each product she will buy can create a risk that the vendor's price schedule "will [not] result in the lowest overall cost to the Government even though it may be the low *evaluated* bid." FAR 52.214-10 (emphasis added). The Agency awarded the contract to PDS even though it fared worse than Superior on experience—a factor more important than price—because PDS's unbalanced price scheme, when weighted by the erroneous expected quantities, seemed to save the taxpayer more than $20 million. The updated quantities necessarily changed that calculus. "Amending" the contract to lock in the unbalanced prices (as PDS suggests) is not the solution; it is the *worst-case* scenario. The Agency acted responsibly by instead disavowing the price profile in the contract and inviting interested contractors to submit prices against the updated baseline of actual need.[7]

Next, the Court also cannot agree that it was unreasonable for the Agency to cancel the Solicitation instead of amending it. PDS suggests that the Agency could have fully rectified the problem by "amend[ing] the Solicitation and request[ing] updated pricing for the impacted [line items]." Pl.'s MJAR at 37. But the Agency determined, after speaking with experts, that the Solicitation required far more sweeping changes, including adding and subtracting line items from the schedule and accordingly modifying several other sections of the Solicitation; developing a new Independent Government Cost Estimate; and preparing a new acquisition plan. AR 3730–31. Those considerations provide "a reasonable motivation for cancellation" entitled to broad deference. *Veterans Contracting Grp., Inc. v. United States*, 920 F.3d 801, 806 (Fed. Cir. 2019).

To be sure, courts may scrutinize a corrective action more closely if the procuring agency's practices are pretextual or otherwise undermine the "overriding public interest in preserving the integrity of the procurement process," *SAGAM Securite Senegal v. United States*, 154 Fed. Cl. 653, 673 (quoting *Bona Fide Conglomerate, Inc. v. United States*, 96 Fed. Cl. 233, 242 (2010))—or, as PDS puts it, if the agency were "fixing the fight" between PDS and Superior, Pl.'s MJAR at 32. To the extent that PDS is alleging that Agency officials acted in bad faith, government employees are presumed to act in good faith, and PDS must present clear and convincing evidence that the officials had "some specific intent to injure the plaintiff[]." *Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) (quoting *Torncello v. United States*, 681 F.2d 756, 770 (Ct. Cl. 1982)); *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239–40 (Fed. Cir. 2002). PDS has presented no evidence of bad faith at

---

[7] Of course, below-cost or unbalanced prices are not inherently undesirable, *see* FAR 15-404.1(g)(1); *Mark Dunning Indus., Inc. v. United States*, 142 Fed. Cl. 734, 749 (2019) (collecting cases), and nothing in this opinion is intended to discourage offerors from proposing unbalanced prices that comply with FAR regulations and, when weighted by the Agency's updated quantity estimates, provide the best value to the taxpayer.

all. In fact, during the pendency of this litigation, the Agency awarded a seven-month bridge contract to PDS, not Superior. Therefore, the Court concludes that the Agency acted in good faith.[8]

## IV.   Conclusion

In summary, the Court holds that plaintiff waived its right to bring this suit under a settlement agreement with the defendant. The Court further holds that the Agency acted reasonably when it terminated plaintiff's contract and canceled the Solicitation. Accordingly, the Court **GRANTS** defendant-intervenor's Motion to Dismiss; **DENIES** plaintiff's Motion for Judgment on the Administrative Record; **GRANTS** defendant's Cross-Motion for Judgment on the Administrative Record; and **GRANTS** defendant-intervenor's Cross-Motion for Judgment on the Administrative Record. The Clerk is directed to enter judgment in favor of defendant and defendant-intervenor consistent with this opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge

---

[8] The Court acknowledges several other arguments made by plaintiff, including: (1) Superior's alleged gamesmanship in withholding usage reports from the Agency has the effect of shrinking the Agency's power to take corrective actions that may or may not benefit Superior; (2) the Agency's decision-makers failed to give adequate weight to PDS's interest in retaining the contract; (3) the Agency's pre-award delays, caused in part by the death of a contracting officer, violated a duty of "good faith and fair dealing" allegedly owed to PDS; and, (4) because defendant's lawyers informed this Court about the contracting officer's decisions the day before she officially announced those decisions, the contracting officer's justifications must have been *post hoc* and unduly influenced by defendant's litigation positions. Pl.'s MJAR at 26–29, 31–34; Pl.'s MJAR Resp. at 12–14. They do not persuade the Court.